JAMES F. ELLISON v. THE MOBILE AND OHIO RAILROAD COMPANY.

1. STATUTES: CONSTRUCTION OF.—A statute must receive such construction as will, if possible, make all its parts harmonize with each other, and render them consistent with its general scope and object.

2. RAILROADS: POWER OF DIRECTORS OF MOBILE AND OHIO RAILROAD COMPANY TO TAKE SUBSCRIPTIONS FOR STOCK.—The board of directors of the Mobile and Ohio Railroad have the sole power, under the charter, to receive subscriptions for stock in the company after its organization. The power to receive subscriptions, vested in the commissioners appointed to organize the company, expired with the election of the first board of directors.

3. CORPORATION: WHEN NOT BOUND BY FALSE REPRESENTATIONS.—A corpora-

tion has no power to bind itself by contract with one of its stockholders, nor to exercise a power conferred, or perform a duty imposed by the charter, for the general benefit of the association. And a person in becoming a member of a corporation, is presumed to contract with reference to its powers and rights as prescribed in its charter, and to give his assent to the exercise of such rights and powers, in the mode and to the extent laid down in the act of incorporation ; and hence, where the directors of a railroad company were authorized by the charter to build the road on such route as they should deem expedient and proper, if a representation be made by the company, to a person about to subscribe for a portion of its capital stock, that the road had been located and should be constructed on a particular specified route, and thereupon, and in consideration thereof, such person became a subscriber, such representation is not binding on the company, and though false and fraudulent, will not release the subscriber from his liability to pay for his stock.

4. EVIDENCE : SPOLIATION AND ALTERATION OF WRITINGS: WHEN HOLDER REQUIRED TO EXPLAIN.—Where a material alteration or addition to a negotiable instrument clearly appears on its face, the law presumes that it was made after its execution, and it is then incumbent on the holder to show its fairness ; but this rule does not apply where it is only *probable,* from an inspection of the writing, that it has been changed in a material part, for that would be to presume fraud upon a mere probability. Whether this rule is applicable to instruments not negotiable, *quære ?*

ERROR to the Circuit Court of Pontotoc county. Hon. William L. Harris, judge.

*Sale* and *Phelan,* for plaintiff in error,

Argued at length that, by the terms of the charter of the defendant in error, the directors had no power to take subscriptions for stock ; that the right was vested in the commissioners named in the charter ; and in this part of the case they cited and relied on the following authorities : *Coulter* v. *Richards,* 24 Miss. R. 329 ; 2 Conn. R. 579 ; *Middletown and Harrisburg Turnpike Co.* v. *Watson,* 1 Rawle, 330 ; *Essex Turnpike Co.* v. *Collins,* 8 Mass. R. 292.

They then argued as follows :

The false representations, alleged in the eleventh answer to have been made by Wheeler, to induce defendant to subscribe for stock, were substantially proved by the witness Louis Ellison, under the general issue. *Brewer* v. *Harris,* 2 S. & M. 84.

We do not, and never did, pretend that those facts could be ver-

bally proved and relied on as stipulations, conditions, and terms, of the written contract. But that they are important as material inducements, held out beforehand to defendant, in order to procure his signature to the written contract, cannot be successfully denied. They are certainly as material and as admissible in evidence as those mentioned in the case of *Brewer* v. *Harris*, 2 S. & M. 84, *supra; Ellis* v. *Martin*, Ib. 187; and *Duncan* v. *Hogue*, 24 Miss. 671.

Whether or not Wheeler had authority from the company to make those representations, and hold out the inducements alluded to, is immaterial to the defence. If they were made by him as agent, and at the time of contracting, and his principals are allowed to adopt his contract, they must take it as it is, with all its incidents, the same as if he had been thereto fully authorized.

The court, therefore, erred in giving to the jury plaintiff's third, fourth, fifth, sixth, seventh, thirteenth, and nineteenth charges, as being adverse to this position, or inappropriate to the issue and the facts as proved; and in refusing defendant's ninth and tenth charges on this point.

The last assignment of error upon which we will insist, and which we think is apparent at the first view, is, the ruling of the Circuit Court, in reference to the alterations, interlineations, and additions appearing on the face of the contract sued on.

The legal proposition embraced in the defendant's second and third charges asked upon this point, is that "if any probable material alteration, interlineation, or erasure, which from its effect is calculated to operate in plaintiff's favor, is apparent on the face of the writing sued on, then the law presumes that it was made after the execution by defendant, and without his consent; and that the contract is thereby null and void, unless plaintiff should prove that the same was made before execution, or with defendant's consent; and that the question of when such change was made, and whether with or without defendant's consent, was exclusively for the jury to consider." In support of this we cite *Railroad Bank* v. *Lum*, 7 How. 414; *Wilson* v. *Henderson*, 9 S. & M. 375; 2 Wendell, 555; 8 Cowen, 71; 9 Cowen, 125; 1 U. S. Dig. 143-4, §§ 70-6; 11 Conn. Reps. 531; 16 Serg. & Rawle, 44; 1 Nott & McCord, 554; 5 Bing. 183.

We now ask the attention of the court to the description and ear-marks of the contract, as set out in the first bill of exceptions. It will there be seen, that both the caption and body of the instrument are printed throughout, except that in the line of the caption which reads thus, viz., "in the county of Pontotoc, and State of Mississippi," the words "Pontotoc" and "Mississippi" are written with a pen, in blanks apparently left for that purpose; and except, also, that the words, "the two and three per cent. not to be called for until March, 1853," are written with a pen and interlined into the caption, as they appear in the copy set out verbatim in the first bill of exceptions; and the same words are also written with a pen, and added after the printed contract had closed with a period, and are inserted between said close and the upper line of the tabular form of the subscription, as shown in said copy. We will here remark, as to the words "Pontotoc" and "Mississippi," written in the caption, that, as they occur in blank spaces, evidently left to be thus filled by writing, and are, moreover, not material to the meaning, effect, and construction of the instrument, we make no objection to them, but regard them the same as if they were likewise printed.

What we insist on as being positively fatal, in the absence of explanatory proof by plaintiff, is the sentence, "the two and three per cent. not to be called for until March, 1853," interlined with a pen into the caption, and added also at the close of the contract. We will first notice the materiality of these words, and then their position on the face of the instrument, and their relation to the other part of it.

It has been decided by the Supreme Courts of several of the States, in cases not necessary here to be cited, and in *Hayne* v. *Beauchamp*, 5 S. & M. 515, and several other later cases in our own High Court, that where the charter itself prescribes that at the time of subscription a cash payment shall be made by the subscriber, then the payment of the money is as indispensable as the subscribing his name, and, without the concurrence of both, the party is not entitled to the privileges of a stockholder, nor, on the other hand, liable on his subscription. But where such cash requirement is not contained in the charter, but is made by the board of directors, then the directors who required it may also dispense

with it. Yet it will not be denied that until it is so dispensed with, it will be as obligatory and as much a necessary part of the contract as if prescribed by the charter. Now, by reference to A. F. Irwin's deposition for plaintiff, it will be learned that Dr. J. M. Cunningham, of Noxubee, was, by the board of directors, made their chief agent in North Mississippi, to receive subscriptions of stock and for other purposes; and that James W. Wheeler was, by the chief engineer, John Childe, made a sub-agent for the same purpose, to act in conjunction with Dr. Cunningham. Irwin's deposition is accompanied by a copy of the written instructions from the board to Cunningham and his co-agents, in the last clause of which they are expressly instructed to require upon all individual subscriptions the payment in money of two per cent. on the amount subscribed, at the time of subscribing. As far as the plaintiff has informed us by testimony, these instructions remain unrevoked to this day; and the printed formula, to which defendant subscribed, strictly conforms to them. But no money having been paid down by the subscriber, according to the instructions under which the sub-agent acted, the contract remained incomplete and ineffectual, unless the cash payment should appear therein to have been in some manner waived or dispensed with. The addition of the words, " the two and three per cent. not to be called for till March, 1853," at the close of the contract, might well be supposed to save the instrument from the effect of the omission. And we will here take the liberty to state, not for the purpose of introducing matters *dehors* the record, but to show what might be the fact in this case, and thus illustrate our objection; that in many, perhaps most, of the subscriptions in the same section of country, taken by the same sub-agent, those written words are added alone at the close, and not interlined also into the caption. The paper, thus fortified, might still have been subjected to the legal criticism that the added words at the close of the contract, being utterly repugnant to the preceding part of the instrument, and irreconcilably inconsistent with that part of it stipulating to pay two per cent. in cash, must be disregarded altogether. It will be found that this view was urged below in this case, and in the Circuit and High Courts, in the case of James S. Alexander, before referred to.

Then, to interline the same words at the beginning of the instru-

ment, was the only plausible way left to overcome this difficulty; and when finally presented, armed thus *cap-a-pie*, the contract might defy criticism. All this, we say, might well occur as part of the history of this and other similar contracts with the same plaintiffs; and, if it might, then the face of the paper becomes suspicious, and calls for the application of the rule of evidence invoked by the defendant. If the sentence be material, there is nothing in the appearance of the paper, as described in the bill of exception, which will withhold it from the influence of the rule.

Down to the place where the added words are introduced, there was printed a complete instrument, perfect in all its parts, and evidently intended, both by its draftsman and printer, to terminate with the words, "from time to time." It is there properly punctuated with a period, as its sense and structure require; and the next (the written) sentence begins with a capital letter. Being after a final sentence, and evidently added (whether with or without authority), and also forcibly repugnant to an important previous stipulation of the instrument, it was *prima facie* as foreign and out of place as any interpolation in a printed instrument can be. The same sentence interlined into the caption, is still more obnoxious to suspicion of its fairness. A stranger, crammed forcibly into a strange vicinity, not only out of place, but still more out of connection with the sense of the immediately surrounding sentences.

It was evidently an after-thought, for it refers to and modifies a dangerous sentence which had already occurred below, and which would have been erased in the first instance if it had been originally intended to be omitted, instead of being reserved to be afterwards nullified by an awkwardly prefixed addition. This suspicion grows into circumstantial certainty, when we compare this interpolation with that added at the close, and observe that the former is written in paler ink, in a different handwriting, and with a different pen. We cannot avoid the conclusion that it was inserted at a different time, and by another person; and, if so, one or the other was wanting at the time of the execution by defendant, unless we gratuitously believe that there had been two distinct alterations at different times, and by different persons, before it was presented for subscription. If it were not as we suppose, why was it not ex-

plained by the plaintiff on trial before the court declined to charge upon it?

When we see a written instrument, with an important interlineation, beneficial to the holder, appearing in ink and handwriting different from the body, we say it is *prima facie* a suspicious feature, requiring explanation to the satisfaction of the jury from him who seeks to enforce it. If the instrument be printed, it is not to be expected that interlineations, in order to subject the holder to the same rule of proof, shall bear precisely the same relation in kind to the body; that is, that they shall be likewise printed, and with different type and ink.

It is sufficient if the suspected sentence seem, from any fact on the face, to have been interpolated; as, for instance, that the characters are different, and made in a different way, and at a place in the instrument *not originally intended;* and the stranger cannot escape question, when it directly changes or modifies the whole, *manifestly to the advantage of the payee or holder.*

How, otherwise, would *any* fraudulent addition to a printed instrument, bear on its face the indications of its true character? In the case of the paper now under consideration, the printed part of defendant's contract included within itself the means of its own defeat, in the two per cent. clause which has not been conformed to, and the effect of which we have already noticed; and the added sentences were expressly intended to change the effect of *that* clause (whether with a fair or fraudulent purpose), by postponing the maturity of the two per cent. to a future day. This, though at first apparently beneficial to the maker to a slight extent, by giving him longer day, yet really, if successful, saved to the payee his entire right of action, and fastened upon the defendant a liability for the whole amount, from which he would otherwise have been exonerated. And yet under these circumstances, and in the face of the foregoing facts, the circuit judge refused to give the second and third charges asked by the defendant. Their correctness, as legal propositions, cannot be denied; and it will not be contended that they are abstract. The question was eminently a proper one for the jury, and should have been left to their consideration.

That it was properly raised under the general issue, see the case of *Wilson* v. *Henderson*, 9 S. & M. 375, *supra.*

If we are right on any of the positions which we have assumed, the defendant was entitled to a new trial.

*Hugh R. Miller* and *J. Robins*, for defendant in error.

It was not necessary to aver in the declaration, that plaintiff was a corporation sole or aggregate.

The act of incorporation is a public act, of which the courts are bound to take notice.

It creates plaintiff a body corporate *eo instanti*, and does not require any act to be done *in futuro*, to entitle it to exercise corporate powers. Ang. & Ames on Corp. § 632–33; 5 Ala. R. 807; 5 N. Hamp. R. 371; 16 Serg. & R. 140; 16 Mo. R. 359. It was not necessary to aver, that the two dollars per share were paid at the time of subscribing.

There is no provision in the charter of plaintiff requiring any amount to be paid at the time of subscribing, and it is only when the *charter requires* such payment, that it is held necessary to the validity of the subscription. 5 S. & M. R. 515.

By the terms of the contract, the payment of the two and three per cent. is postponed until the 1st of March, 1853, and although the provisions of the instrument on this subject are apparently incongruous, yet the intention is manifest.

This very question has been determined by this court.

*Josiah Roberts* v. *The Mobile and Ohio R. R. Co.* 32 Miss. R. 373; *Porter Walker* v. *Same*, 34 Ib. 245.

The contracts sued upon, in the cases cited, were identical with that in this case.

There was, therefore, no error in overruling the demurrer to the declaration.

The demurrer of plaintiff to the 2d, 3d, 4th, 5th, 6th, 7th, 8th, 10th, 11th, and 12th answers was rightly sustained.

These 2d, 3d, 4th, and 5th answers all admit the existence of the corporation, and that certain persons assume to possess and to exercise the corporate powers granted by the charter, and set up facts, which amount to nothing more than *irregularities in the organization of the company*,—the *usurpation* and *misuser* of the powers granted by the charter. Advantage can only be taken of such matters by process, on behalf of the State. *Smith* v. *Miss. and Ala.*

*R. R. Co.* 6 S. & M. 179; 6 Cow. R. 23; Ang. & Ames on Corp. § 635–36; 7 Metcalf R. 595; *Grand Gulf Bank* v. *Archer*, 8 S. & M. 151.

The 6th, 7th, and 10th answers aver, in substance, that the subscription sued upon was not taken on behalf of plaintiff by the persons named in the first section of the charter, or by any one authorized by them, and that it has not been ratified or adopted by them.

In the case of *Porter Walker* v. *M. & O. R. R. Co.* 34 Miss. R. 245, this court said that, "though the agent acted without authority of the company in taking the subscription, yet the act was adopted and ratified by the company, as was fully shown by the act of bringing suit upon the subscription." "And as the act of ratification appeared by the record, it was competent for the court to notice it in determining the sufficiency of the plea, &c." Dunlap's Paley on Agency, 171, note o; 17 Mass. R. 97; 1 Adolph. & Ellis, 526; 4 S. & M. 75–83; Ang. & Ames on Corp. §§ 240, 304.

The representations alleged in the 11th and 12th answers, to have been made by the agent who took the subscription, were wholly immaterial,—were merely the expression of opinions about matters, in relation to which each party had an equal opportunity to be informed, and to allow which, as a matter of defence, would be to add to and vary the written contract by parol.

What was the subject of negotiation? The plaintiff proposed to sell, and the defendant to purchase, ten shares of the capital stock of the company. What rights and benefits could defendant acquire by the purchase? Certainly, not the right to have the road located on this or that route, or to have the money subscribed expended on any particular part of the road; for these things form no part of the consideration of a subscription for stock in a joint-stock company. The sole consideration in such cases, is a right to the privileges and franchises of a member of the corporation which the subscriber acquires. Ang. & Ames on Corp. §§ 517, 518, 541; 2 Penn. R. 466.

Whether the road was located upon one or another route, or the money was expended upon one or another part of the road, could neither diminish nor enhance the consideration.

The defendant is presumed to have had a knowledge of the pro-

visions of the charter, which authorizes and requires the company to locate the road between certain termini, " on such route as shall be deemed most expedient." Nor would such representations have bound the company, if made; for it would have been their duty to have altered and changed the route, if they believed it expedient to do so. *Hester* v. *Memphis and Charleston Railroad Company*, 32 Miss. R. 378; Ang. & Ames on Corp. § 537; 8 Mass. R. 268; 32 Miss. R. 347.

But the alleged representations were the mere expressions of opinion. The agent could not possibly know where the road would be located, or that the location would not be changed, or where it would be necessary to expend the money, or what per centum would be called for, or what the donated·lands would be worth, or what the profits of the road would be. *Anderson* v. *Burnett*, 5 How. R. 165; *Bell* v. *Henderson*, 6 Ib. 311; *Anderson* v. *Hill*, 12 S. & M. 679; *Walker* v. *M. & O. R. R. Co.*, 34 Miss. R. 245.

The defendant asked charges of the court, with reference to a pretended alteration of the contract. There was no plea of *non est factum*, or plea denying the execution of the contract; nor was there any proof on the subject of the alleged alteration.

The contract was read to the jury without objection.

It is recited in the bill of exceptions, that " the ink and penmanship appeared to be different in some of the written portions."

It is submitted that these recitals cannot be regarded by this court.

To whom did these things appear? To the judge, or to the jury? How could it appear, in the absence of any testimony on the subject? If it appeared to the judge from inspection, the party could have no benefit from it, except by motion to exclude it from the jury, which was not made. The result of an inspection by the court below, cannot be thus communicated to this court. If an instrument is to be judged by inspection, it should be sealed up and transmitted to this court, as provided by statute.

The pretended alteration, amounts to nothing more than the filling up of blanks, apparently left for that purpose, and adding to the printed form, in writing, the clause postponing the time for payment of the two and three per cent.

No authority can be found to support the position, that the mere

fact, that an instrument is in part printed, and in part written, raises a presumption that it has been altered since executed. Such a rule would subject to suspicion nine-tenths of the commercial paper in circulation.

The suggested alteration is not beneficial to plaintiff; and, in such case, the presumption is, that it was made before execution. *Wilson* v. *Henderson*, 9 S. & M. 375; 11 Conn. R. 531; 2 New Hamp. R. 543; 16 Serg. & R. 44.

In the cases found in 7 How. R. 414, and 1 Nott & McCord, 554, referred to on the other side, there were pleas of *non est factum*.

The proof on the part of the defendant shows nothing more than the facts alleged in the 11th and 12th answers, which were held bad on demurrer. The cases of *Ellis* v. *Martin*, 2 S. & M. 187, and *Brewer* v. *Harris et al.* Ib. 84, are not at all analogous to the case at bar. The defence, the court say, set up in those cases, was " designed to show a total failure of the consideration of the notes."

Here, the representations do not tend to impair the consideration.

What we have said on the demurrer to defendant's answers (and the authorities there cited), is equally applicable to the charges asked by defendant and refused by the court.

The position assumed by defendant's counsel, that the president and directors of the company have no power under the charter to take subscriptions for stock, it wholly untenable.

The 7th section provides that the directors " shall have power to make and prescribe by-laws, regulations, &c., touching the disposition and management of the stock." What stock? Certainly not the stock already disposed of. How could they dispose of stock except by selling, or permitting persons to subscribe for it? When $250,000 of stock was subscribed, directors might be elected, and when elected, they are authorized to dispose of the remaining stock authorized by the charter, not exceeding ten millions.

HANDY, J., delivered the opinion of the court.

The defendant in error brought this action to recover the amount of certain instalments, due upon a number of shares of the capital stock of the company, for which the plaintiff in error had become a subscriber.

The declaration alleged that the defendant in the court below,

before the 1st of March, 1853, had subscribed for ten shares of the stock of the company, according to the written subscription signed by him and set forth, and averring that the instalments, according to the subscription, had been called for, and required to be paid by the president and directors of the company, and that they were requisite for the payment of contracts for the construction of the road of the plaintiff. The defendant demurred to the declaration, and upon his demurrer being overruled, he filed thirteen pleas, to all of which the plaintiff demurred, except the first, ninth, and thirteenth, to which he replied. The demurrer to these pleas was sustained, and the case was tried upon the issues presented by the first, ninth, and thirteenth pleas and replications. Upon the trial, sundry instructions were given to the jury, at the instance of the plaintiff, and several asked in behalf of the defendant were refused. The rulings of the court upon these points, and the sustaining of the plaintiff's demurrer to the pleas, present the questions now to be determined.

It is unnecessary to state the pleas and proceedings in detail, which give rise to the points in controversy; and we will proceed to consider the questions involved in the rulings of the court, as they are presented and discussed in behalf of the plaintiff in error.

The first question presented is the validity of the subscription. It appears by the evidence offered on the trial,—and it is in substance stated in one or more of the pleas,—that the subscription for stock was made and contracted by the plaintiff in error with one Wheeler, acting under authority from John Childe, the general agent of the company, appointed by the board of directors to obtain subscriptions of stock, and appoint agents and commissioners for that purpose; that Wheeler's acts in obtaining subscriptions were from time to time reported to and approved by the board of directors, and that compensation was allowed him for his services. And it is now insisted, in behalf of the plaintiff in error, that the board of directors had no power to take and contract for subscriptions, nor to appoint agents with power to do so, nor to ratify them when so taken; but that this power is conferred upon the commissioners named in the first section of the charter of the company, and other stockholders to be associated with them, who alone are authorized by the third section of the charter to receive subscriptions. Hence

it is contended, that this subscription was void, neither conferring upon the subscriber the rights of a stockholder, nor creating any liability to pay the stock subscribed.

This position appears to be based mainly upon the provisions of the third section of the charter. That section authorizes certain persons named in the first section to open books to receive subscriptions to the stock, at such times and places as they, or a majority of them, should appoint, giving notice thereof, and to receive subscriptions under such regulations as they should adopt; " and if more than five thousand shares of stock should be subscribed, they should have the power to make the shares so subscribed the capital stock of said company:" Provided, they should not exceed one hundred thousand shares. And in case the subscriptions should exceed one hundred thousand shares, the same should be reduced and apportioned in such manner as might be deemed most beneficial to the corporation." And it is said that the fifth section adds strength to this view. It provides that those persons authorized to receive subscriptions, " are also authorized, after the books of subscription to the capital stock of said company are closed, or when the sum subscribed shall exceed two hundred and fifty thousand dollars, to call the first meeting of the stockholders," for the purpose of choosing directors to the company. These provisions, it is insisted, contemplate the exercise of the power of receiving subscriptions, by the commissioners named for that purpose, after the directory should have been elected and the company organized, and until the subscriptions for stock should be closed, and all the stock taken. But we do not consider the position at all tenable.

It is manifest, that it was the object of the charter, in appointing commissioners to receive subscriptions for stock, to take preliminary steps for the organization of the corporation,—to ascertain who were the constituent members who were to form the company, to the end that such persons might proceed to organize it, by electing directors to take charge of it and manage its concerns; for without some such initiatory steps, such a company could never go into operation. The powers conferred upon the commissioners must be viewed with reference to this object, and in their nature are preliminary and temporary, to answer the necessity of the case.

By the third section, they are authorized to receive subscriptions,

under such rules and regulations as they might adopt. This was for the purpose of ascertaining what persons should vote for directors, and in order that the corporation should be regularly organized; and accordingly, by the fifth section, they are authorized, after the books of subscription are closed, or when the subscriptions shall exceed the sum of two hundred and fifty thousand dollars, to call the first meeting of the stockholders, to elect directors. They are authorized to establish who are the stockholders entitled to vote for directors. But after the directors have been elected, the end of their appointment has been accomplished, and there appears to be nothing in the charter contemplating a continuance of their power.

The provision in the third section, that " if more than five thousand shares of stock should be subscribed, the commissioners should have the power to make the shares so subscribed, the capital stock of said company," cannot be justly construed to continue their powers after the organization of the company; for that would be to give them power over the directory, to determine a question which they have not the information properly to determine. It cannot be supposed, that it was intended to give such persons authority to determine so important a question, to the exclusion of the power of those, to whom the entire interests of the corporation were committed. And yet such appears to be the literal import of the language, and the construction contended for. But the provision must receive such a construction as will harmonize with the general scope of the charter, as to the powers of the board of directors, and, at the same time, preserve to the commissioners their proper functions. So considered, we think that it was intended to give to the commissioners the power to make the shares subscribed before them, the capital stock, to the end that the subscribers should be entitled to vote for directors, according to the shares ascertained and declared by the books of subscription.

This view is consistent with the fifth section, which requires, that when the books of subscription are closed, or so soon as the sum subscribed shall exceed two hundred and fifty thousand dollars, the commissioners shall call the stockholders, to choose directors. The clause, " *when the books of subscription are closed*," here used, is evidently without force, and loosely employed; for, by the second

section, the company is authorized to organize, and go into operation, whenever the capital stock subscribed should exceed two hundred and fifty thousand dollars; and the latter clause of the fifth section above stated, requires the commissioners to call the first meeting of the stockholders, for the choice of directors, in the same event. It was, then, the duty of the commissioners, to call upon the stockholders to choose directors, when the amount specified was subscribed, and not to wait until the books of subscription were *closed;* that is, until all the stock required to be taken should be subscribed. Hence, the language employed in this section does not justify the construction, that the powers of the commissioners were continued after the organization of the company.

But it appears to be clear, from other provisions of the charter, as well as from the nature and object of the appointment of the commissioners, that their functions were at an end, and that the power to receive subscriptions for stock vested in the board of directors, upon their election and organization. The seventh section gives the directors full power to make rules and regulations, in their discretion, *"touching the disposition and management of the stock,"* &c. . . . "and all matters whatsoever, which may appertain to the concerns of said company." The power here given, as to the disposition of the stock, is unqualified; and, from the nature of the subject, necessarily excludes the exercise of the power by any other persons. The necessity for any action in the matter by the commissioners had ceased, by the election and organization of the regular executive powers of the corporation; and the right in question could nowhere be so safely intrusted, as to that power. A construction founded on vague and doubtful phrases, holding that the important right conferred upon the directors, in plain terms, by the charter, is to be exercised by others, is not to be indulged.

We think, therefore, that there is no error, in the various rulings of the court upon this point.

The next question to be considered is, whether the alleged false statements made by the agent of the company, at the time the plaintiff in error subscribed for stock, in relation to the location of the road, and in consequence of which the subscription was made, rendered the contract invalid as to the subscriber.

The testimony before the jury upon this point was, in substance,

that the subscription was obtained by Wheeler, an agent of the company to obtain subscriptions for stock, who spoke to the plaintiff in error of the great advantages which the road would afford to the community and to the plaintiff in error, and how it would increase the value of his property. That he refused to subscribe, unless the road would be located to run through Pontotoc county, where he resided, and the money subscribed should be expended upon the road in that county, as far as necessary. That Wheeler replied that two routes had been surveyed, one the eastern and the other the western, and that the engineer had already located the road on the western route, which run about twelve or fourteen miles in the county. It was then in evidence that the road has been located, and is in process of construction on the eastern route, which runs parallel with the western, at a distance of about half a mile or three-quarters of a mile apart, and that the eastern route runs through the county not exceeding one hundred yards. Upon this evidence the plaintiff in error asked the court to instruct the jury as follows: "If the jury believe from the testimony that, at the time when Wheeler, on the part of the plaintiff, procured defendant to execute the contract herein sued on, said defendant declined to take stock, unless plaintiff's road should be located on the western route, through the county of Pontotoc, being the one nearest the defendant, and that thereupon, as inducement to defendant to execute said contract, said Wheeler untruly represented to defendant, that said road had already been located on said western route, and if such location was really and actually material to defendant to any extent, then such untrue representation by Wheeler was a fraud upon defendant, and makes the contract thus procured null and void."

This instruction was refused, and the court instructed the jury, at the instance of the defendant in error, as follows: "That the charter of the Mobile and Ohio Railroad Company, empowers the president and directors to locate the road on such route as they may think proper, and to alter and change the location of any part of it, as they might deem proper; and that no change of location would affect th᷉ liability of the subscriber for stock, unless it works an essential change in the character of the enterprise, such as a change of the main termini of the road." The same principle

was embraced in other instructions, and was also involved in the demurrer to the eleventh plea, sustained by the court.

Conceding that the alleged representations were untrue, and that the plaintiff in error was induced by them to subscribe, and that they are binding on the company, let us consider the effect which they can have in law, upon the liability of the plaintiff in error upon his subscription.

The contract of subscription necessarily had reference to the charter of the company, which was the great law, both of the liability and of the rights of the stockholder. He must be held to have subscribed for stock, subject to the rules therein declared, and to the powers therein expressly granted, or necessarily implied; and no consideration* can be permitted to enter into and form a part of the contract of subscription, which is incompatible with the powers granted in the charter, or which may be prejudicially affected by the exercise of the legitimate powers and duties appertaining to the company under its charter. So far as the nature and obligation of his contract are defined and secured by express stipulation in the charter, he has the right to insist upon the strict law as forming the basis of his contract; but when, from the nature of the provisions of the charter, a general power is conferred upon the company, the exercise of which may operate to his inconvenience or disadvantage, he is to be presumed to have contracted with that view, and must submit to its operation. For, in becoming a subscriber, he adopts the charter as the fundamental law, alike securing his rights and measuring his obligations; and he cannot be heard to say that he became a member, upon an agreement that the power given for the general benefit would not be exercised towards him, for that would be to give the power to the corporation to violate its duty to act for the general good, by yielding to individual convenience, which would be destructive of the objects of the association. The promotion of the general good is the paramount law of its operation, within the limit of its powers; to that he assented in becoming a member, and he cannot be permitted to set up a right founded upon a violation of that duty.

Let us apply these general principles to the circumstances of this case. The charter of the defendant in error prescribed no route for the road, but its location was left entirely to the discretion of

the company. This necessarily involved the power to change the route when located; and when, in the judgment of the board of directors, it might be necessary and expedient to the best interests of the company, it became their duty to make the change. This high duty the subscriber was bound to know, and to assent to, when he became a member of the company. He was bound to know that the company could not make conditions, to be obligatory, which might be destructive of the best interests of the road, and that such things must depend upon their discretion. He subscribed subject to this paramount law of the corporation; and any individual advantages offered to him at the time of his becoming a subscriber, must be taken as made subject to the condition, that a compliance with them should not be deemed by the board of directors inconsistent with the general good of the company. From the very nature of the enterprise, and from his becoming a partner in it, his individual convenience must yield to the general good. In becoming a member, he came under the obligation to submit the matter of the location of the road to the discretion of the constituted authority, and cannot be heard to insist upon an advantage inconsistent with it. The assurances given him in relation to the location of the road, cannot, therefore, under the circumstances, be considered as a part of the consideration for his contract, but must be taken as a matter of collateral benefit expected from it, which must yield to the paramount right of the company to change the route, an essential and fundamental condition of the operations of the company. *Irvin* v. *Turnpike Co.* 2 Penn. 466.

Hence the representations relied on were insufficient, in law, to invalidate the contract, and the rulings of the court upon the question were correct.

It is to be observed that, in this case, no right contained in the charter, and which may be regarded as forming a consideration for the contract, has been affected. And, in this respect, it differs from the case of *Hester* v. *Memphis and Charleston Railroad Co.* 32 Miss. 378, in which the route, as prescribed by the charter, was materially changed; and considering the charter as the foundation of the contract, it was there held that the change of the prescribed route discharged the subscriber from liability to pay his stock, subscribed with reference to the rights secured by the charter. This

proceeds upon the ground that the charter defines the rights of the members of the corporation, and determines the nature of their liability as stockholders; and it follows from the principle there held, that where no right secured in the charter is violated, and the acts of the company are in accordance with their charter powers, the subscriber is not discharged.

The remaining question to be determined is, whether the contract of subscription must be taken to be void by reason of a material alteration apparent from its face.

It appears, from the bill of exceptions, that the subscription paper was all printed except the words *Pontotoc* and *Mississippi*, which were inserted in blanks left for the purpose, and the words, "*the two and three per cent. not to be called for until March,* 1853," which clause was inserted by interlineation, in writing, at the caption of the paper, and is also added in writing at the conclusion of the printed part of the paper, between the close of the printing and the place intended for the subscriber's name. The written words, at the caption, are apparently in a different handwriting, and with paler ink than those written at the close, and the marks are smaller, as if with a different pen. The printed part, in substance, subscribes for the number of shares attached to the signature, agreeing to pay for the same, one hundred dollars for each share, payable two dollars per share at the time of subscribing, three dollars per share in three months from the same date, and the remainder when requisite, &c. The alleged alterations and additions are, "*the two and three per cent. not to be called for till March,* 1853."

Upon this evidence, the plaintiff in error asked the court to instruct the jury as follows: "If any probable alteration, addition, or interlineation, in a material part of the contract sued on, is apparent on the face of it, and if such alteration, addition, or interlineation is, from its effect, calculated to operate in favor of the plaintiff, then the law presumes that the same was made after the execution of the contract, and without Ellison's consent, and the contract thereby becomes null and void, unless the plaintiff has proved to them, by testimony, that such alteration, addition, or interlineation, was made before the contract was signed by the defendant, or that it was made afterwards, with his consent; and,

unless such proof is made, the jury must find for the defendant." The court refused to give the instruction.

The rule upon the subject of the instruction is well settled in this court, with respect to negotiable instruments. *Railroad Bank* v. *Lane*, 7 How. 414; *Wilson* v. *Henderson*, 9 S. & M. 375. It has, however, never been held by this court to be applicable to other instruments, and the cases are numerous holding it not applicable to other instruments. 3 Phill. Ev. (Cowen & Hill's notes) 463, 3d edit.; *Bailey* v. *Taylor*, 6 Conn. R. 2d series. But, upon this point, we deem it unnecessary to express an opinion at this time.

Conceding the rule to be applicable to instruments of the character of the one here sued on, we still think that the instruction was properly refused.

In order to raise the presumption, that the instrument has been altered, and to put the holder to proof explaining it, it is necessary that it plainly appear from the face of it that it has been altered. It is not sufficient that it is *probable* that an alteration has been made, but it must be manifest to the inspection of the jury that it has been made. The consequences of an alteration, apparent from the face of the paper, are so serious to the holder, especially when he has no notice, by pleading or otherwise, that he will be required to show its fairness, that the fact upon which the presumption of unauthorized or fraudulent alteration is founded should not depend upon mere probability; for that would be to found one presumption upon another, and to presume fraud upon mere probability. In this respect the instruction was erroneous.

With reference to the evidence touching the point of alteration, which consisted entirely of the paper itself, this instruction was calculated to have a very prejudicial effect in this respect upon the validity of the paper. There was nothing to show that the clause, added at the close of the printed part of the paper, was not written as a part of the contract agreed on between the parties. The mere fact that it was written, instead of being printed, in a space where it very properly might have been written by agreement of the parties, was not sufficient to raise the presumption that it was done without the consent of the subscriber. If so, any contract of a special character, part of which is printed and part in writing, or several parts of which appear to be in different handwritings, must

be taken to have been unfairly altered and rendered void, unless explained. Yet, under the rule stated in the instruction, the jury, though not *satisfied* that it was not the contract as agreed on by the parties, were authorized to conclude, upon undefined probability, that the instrument had been altered after it was completed, without the consent of the subscriber. The rule, as stated, was clearly improper with reference to the paper as it is described in the record; and, from that description, we do not think that the jury would have been justified in finding that the writing at the close of the paper was not done by the agreement of the parties.

Under this view, the interlineation in the caption was immaterial, because it was the same as that written at the conclusion, and was but a repetition of it.

Having considered the several grounds of error urged in behalf of the plaintiff, we think the judgment correct, and it is affirmed.

HARRIS, J., having presided on the trial in the court below, did not sit in this case.